IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMBER MCREDMOND, individually and as the Administratrix of the Estate of ROBERT MCREDMOND, SR., and ROBERT MCREDMOND, JR., individually,<br><br>Plaintiffs,<br><br>v.<br><br>HCR HEALTHCARE, LLC, HCR II HEALTHCARE, LLC, HCR III HEALTHCARE, LLC, HCR MANOR CARE SERVICES, LLC, MANOR CARE-PIKE CREEK OF WILMINGTON, DE, LLC, PROMEDICA HEALTH SYSTEM, INC., and PROMEDICA SENIOR CARE MEDICAL SERVICES I, LLC,<br><br>Defendants. | Civil Action No. 22-692-CFC |

Patrick Christopher Gallagher, JACOBS & CRUMPLAR, P.A., Wilmington, Delaware

    *Counsel for Plaintiffs*

Geoffrey Graham Grivner, Kody Macgyver Sparks, BUCHANAN INGERSOLL & ROONEY PC, Wilmington, Delaware; Joshua T. Calo, David L. Gordon, BUCHANAN INGERSOLL & ROONEY PC, Princeton, New Jersey

    *Counsel for Defendants*

# **MEMORANDUM OPINION**

December 20, 2022
Wilmington, Delaware

_____
COLM F. CONNOLLY
CHIEF JUDGE

Robert McRedmond, Sr., (Robert Senior) was a patient in a skilled nursing facility in New Castle County, Delaware just before he passed away from COVID-19 in May 2019. That facility was operated by Defendants ProMedica Health Systems, Inc., HCR Healthcare, LLC, ProMedica Senior Care Medical Services I, LLC, HCR II Healthcare, LLC, HCR III Healthcare, LLC, Manor Care-Pike Creek of Wilmington, DE, LLC, and HCR Manor Care Services, LLC (collectively, Manor Care). Robert Senior's children, Plaintiffs Robert McRedmond, Jr. (Robert Junior) and Amber McRedmond, brought this suit for negligence and wrongful death against Manor Care in the Superior Court of the State of Delaware in New Castle County. Manor Care removed the case to this Court pursuant to 28 U.S.C. § 1441(a).

Manor Care has now moved to compel arbitration of Plaintiffs' claims under 9 U.S.C. § 1, *et seq.*, or alternatively to dismiss the case for lack of subject matter jurisdiction and failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). D.I. 15. I have subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) and 9 U.S.C. § 4.

I.  **BACKGROUND**[1]

A.  **Robert Senior's 2018 Admission to the Pike Creek Facility**

In June 2018, Robert Senior was admitted to a skilled nursing facility operated by Manor Care in Pike Creek, Delaware. D.I. 13 ¶¶ 4, 61. Pike Creek is located in New Castle County. Robert Senior was discharged from the Pike Creek facility in July 2018. D.I. 13 ¶ 61. In the ensuing months, he spent periods of time living at home with his children, in a hospital, and in another nursing facility. D.I. 13 ¶ 61.

B.  **Robert Senior's 2019 Admission to the Pike Creek Facility**

In May 2019, after having suffered a stroke, Robert Senior was re-admitted to the Pike Creek facility. D.I. 13 ¶ 62. Upon his re-admission, Manor Care presented Robert Senior and Robert Junior with two standard form contracts: an "Admission Agreement between Patient and Center" (the 2019 Admission Agreement) and a "Voluntary Arbitration Agreement" (the 2019 Voluntary Arbitration Agreement). D.I. 13 ¶ 63; D.I. 13-2.

Robert Junior signed the 2019 Admission Agreement as the "Responsible Party" for his father, who is identified in the Agreement as "Patient." D.I. 13-2 at 2. (Under section four of the 2019 Admission Agreement, the "Responsible

---

[1] Unless stated otherwise, the following facts are taken from the Amended Complaint and the documents referenced in the Amended Complaint. *See* D.I. 13.

2

Party's Responsibilities" include, among other things, "[p]ay[ing] for all charges that Patient incurs while at the [Pike Creek facility] from the Patient's income or resources," "[n]otify[ing] [Manor Care] immediately and in writing if the Patient's financial resources are depleted," and "[s]ecur[ing] Medicaid in a timely and proper manner." D.I. 13-2 at 4.)

Under the heading "Other Documents that require your signature," the 2019 Admission Agreement lists four documents, one of which is the "Voluntary Arbitration Agreement, if elected." D.I. 13-2 at 2. Section five of the 2019 Admission Agreement, titled "Venue Notice," provides in relevant part:

> All claims relating to . . . any past, present or future admission of the Patient to the [Pike Creek facility], including . . . any claim relating in any way to the care and treatment provided to the Patient, will be brought in the Court of the County and State where the [facility] is located. . . . If you agree to the Voluntary Arbitration Agreement, which is a separate agreement from this Agreement, the Voluntary Arbitration Agreement will control. If, however, the Voluntary Arbitration Agreement is not signed or it is not enforced for any reason, this Venue Notice section will control. If you do not agree to this Venue Notice section, please initial here: ___

D.I. 13-2 at 4. Neither Robert Senior nor Robert Junior initialed the Venue Notice section. *See* D.I. 13-2 at 4.

Paragraphs 1 and 2 of the 2019 Voluntary Arbitration Agreement read as follows:

3

1. **<u>Voluntary Agreement to Arbitrate Disputes</u>**. The parties agree that they will mutually benefit from the speedy and efficient resolution of any dispute or controversy which may arise between them. This is a voluntary Agreement to have all disputes resolved through binding arbitration by an independent neutral Arbitrator who will be selected by the parties as specified in this Agreement. THE PARTIES AGREE THAT THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. ANY DISPUTES BETWEEN THE PARTIES WILL BE RESOLVED EXCLUSIVELY THROUGH BINDING ARBITRATION.

2. **<u>Parties</u>**. This Agreement and the definitions in this Section will be interpreted as broadly as possible so as to bind and benefit any person who asserts any claim or against whom a claim is asserted by or on behalf of [Manor Care] or the Patient. The parties intend to allow any person alleged to be liable for any actions or inactions of [Manor Care] or the Patient or related to any care provided to the Patient to demand arbitration pursuant to this Agreement.

   \* \* \* \*

   b. "Patient" includes the Patient, the Patient's Representative, the Patient's guardian, attorney-in-fact, agent, sponsor, or any person whose claim is derived through or on behalf of the Patient, including any spouse, child, parent, executor, administrator, personal representative, heir, or survivor, as well as anyone entitled to bring a wrongful death claim relating to the Patient. The Patient is an intended third-party beneficiary of this Agreement.

D.I. 13-2 at 15 (capitalization in the original).

Robert Senior refused to sign the 2019 Voluntary Arbitration Agreement, and his refusal "was noted on the document." D.I. 13 ¶ 63; D.I. 13-2 at 17

4

(handwriting stating "declined to sign"). Robert Junior also did not sign the 2019 Voluntary Arbitration Agreement. *See* D.I. 13 ¶ 63; D.I. 13-2 at 17.

## C. The Actions That Led to This Suit

Robert Senior did not leave the Pike Creek facility until shortly before his death on May 19, 2020. D.I. 13 ¶¶ 62, 73. During his approximately year-long stay at the Pike Creek facility, the COVID-19 pandemic struck. Between the onset of COVID-19 and May 12, 2020, Manor Care told Robert Senior's family that he had a room to himself to protect him from COVID-19, when, in reality, he had a roommate who died of COVID-19. D.I. 13 ¶ 67. During a video chat with Robert Senior in May 2020, Robert Junior observed a nurse in Robert Senior's room not wearing a mask. D.I. 13 ¶ 69. When Robert Junior questioned the nurse about her not wearing a mask, she said the call was "breaking up" and, at that point, the call disconnected. D.I. 13 ¶ 69. When the call resumed, the nurse was wearing a mask. D.I. 13 ¶ 69.

Robert Senior's daily progress notes indicate that he had a cough and shortness of breath on May 8, 2020 and that he was in respiratory isolation on May 9 but not in respiratory isolation on May 10. D.I. 13 ¶¶ 70–71. It appears from the progress notes that Manor Care did not check Robert Senior's vital signs from May 7 through May 12. D.I. 13 ¶ 72. On May 12, Robert Senior was noted to have had difficulty breathing, swollen lower extremities, and a pale complexion; and "[a]

5

decision was made to send him to [a hospital's emergency room] for evaluation." D.I. 13 ¶ 73. At some point (the Amended Complaint does not give a date), Robert Senior was transported to Christiana Hospital, where he tested positive for COVID-19 and was intubated. D.I. 13 ¶ 73. Robert Senior died on May 19, 2020 "due to COVID-19." D.I. 13 ¶ 73.

## II. PROCEDURAL POSTURE AND ISSUES BEFORE ME

On April 14, 2022, Plaintiffs sued Manor Care in the Superior Court of the State of Delaware in New Castle County, Delaware. D.I. 1-1 at 6. The Superior Court is the trial court of general jurisdiction in Delaware, and thus the Delaware state court where negligence and wrongful death claims are tried. *See* DEL. CONST. art. IV, § 7; 10 Del. C. § 542. Notwithstanding the fact that the 2019 Admission Agreement explicitly states that "[*a*]*ll claims* relating to . . . *any past, present or future admission* of the Patient to the [Pike Creek facility], including . . . *any claim relating in any way to the care and treatment* provided to the Patient, *will be brought in the Court of the County and State where the [facility] is located*," D.I. 13-2 at 4 (emphasis added), Manor Care removed the case to this Court, thereby depriving Plaintiffs of the venue the parties had contractually agreed to. D.I. 1.

Compounding this deprivation and causing further delay and attorney fees for Plaintiffs to litigate this motion, Manor Care has moved to compel arbitration

6

of Plaintiffs' claims. Now, given the express language of the 2019 Admission Agreement and the undisputed fact that neither Robert Senior nor Robert Junior signed the Voluntary Arbitration Agreement presented to them by Manor Care in 2019, you might be thinking, how could that be? Well, it turns out that when Robert Senior was admitted to the Pike Creek facility in June 2018, he signed the exact same standard form Voluntary Arbitration Agreement he and his son refused to sign in 2019. And Manor Care argues that because the language of that standard form agreement covers "any dispute or controversy" between the parties—with no limitations on the timing or nature of the dispute or controversy—I have no choice but to send Plaintiffs' case to arbitration. D.I. 16 at 7–9. Manor Care also takes the position that I lack the power to question its assertion that the 2018 Voluntary Arbitration Agreement covers this dispute because the language of the agreement delegates all questions of arbitrability to the arbitrator. D.I. 16 at 9–10.

## III. ANALYSIS

Whether Plaintiffs' claims are subject to arbitration turns on whether the 2019 Admission Agreement and 2019 Voluntary Arbitration Agreement superseded the 2018 Voluntary Arbitration Agreement. But the first question before me is who makes that determination—the Court or the arbitrator? The Third Circuit recently answered this threshold question in *Field Intelligence Inc v. Xylem Dewatering Solutions Inc*, 49 F.4th 351 (3d Cir. 2022).

7

Like the parties here, the parties in *Field Intelligence* signed two contracts; and, like here, the earlier contract required arbitration, but the later contract did not. *Id.* at 353. Field Intelligence sued Xylem in federal court for breach of the later contract. Xylem responded by filing a demand for arbitration based on the earlier contract and moving to stay the federal lawsuit. Field Intelligence opposed Xylem's motion and cross-moved to enjoin the arbitration. The district court granted Field Intelligence's request to enjoin the arbitration and denied the motion to stay as moot. Xylem appealed that ruling.

On appeal, the Third Circuit recognized at the outset of its analysis that parties "may . . . agree to delegate to an arbitrator 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Id.* at 355 (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019)) (some internal quotation marks omitted). It then stated that the appeal before it involved the "threshold question" of "whether Field Intelligence is bound by the arbitration provision in the parties' 2013 contract, or whether the 2017 agreement superseded that contract completely, thereby eliminating [Field Intelligence's] duty to arbitrate." *Id.* at 355–56. The Court continued:

> Two issues stem from this gateway concern. First, who should decide whether the second contract replaced the first, a court or an arbitrator? Second, if a court, rather than an arbitrator, should decide, does the parties'

8

> [second] contract in fact supersede their earlier agreement?

*Id.* at 356.

With respect to the first issue—the same initial issue before me here—the Court held that "the parties' supersession dispute is for a court, not an arbitrator, to decide." *Id.* The Court explained:

> Th[is] conclusion flows necessarily from a first principle of arbitration law: that "arbitration is strictly a matter of consent." An arbitrator's authority is limited to those claims that "the parties have agreed to submit to arbitration." So before sending parties to an arbitrator, a court must decide whether they agreed to resolve their dispute in that forum, which in turn requires it to determine "whether an arbitration agreement exists at all[.]" Because the substance of the parties' supersession dispute is "whether there is an agreement to arbitrate," the District Court rightly declined to send it to an arbitrator.
>
> Xylem asks us to view this case differently. It points to the general rule, referenced above, that parties may delegate threshold arbitrability issues to an arbitrator provided there is "clear and unmistakable" evidence they agreed to do so. The 2013 contract's arbitration provision, it says, contains such clear and unmistakable evidence, as it expressly delegates arguments over its "termination or invalidity" to an arbitrator. Hence that person, not a court, must decide the supersession dispute.
>
> Were this fight simply about whether the 2013 agreement had terminated or was invalid, we might agree. But the question here is whether, by the later contract, the parties intended to extinguish their prior agreement and litigate any disputes between them moving forward. Put another way, if Field Intelligence is correct that the 2017 contract

9

> superseded the 2013 agreement, then there is no arbitration agreement for us to enforce. And "it can hardly be said that contracting parties clearly and unmistakably agreed to have an arbitrator decide the existence of an arbitration agreement when one of the parties has put the existence of that very agreement in dispute."

*Id.* at 356 (internal citations omitted).

Accordingly, I turn to the question of whether the 2019 Admission Agreement and 2019 Voluntary Arbitration Agreement supersede the 2018 Voluntary Arbitration Agreement. The answer to that question is clear—yes.

The parties agree that Delaware law governs the interpretation of the agreements. *See* D.I. 16 at 8–9; D.I. 25 at 7; D.I. 26 at 4. "Delaware recognizes that where a new, later contract between the parties covers the same subject matter as an earlier contract, the new contract supersedes and controls that issue, if the two agreements conflict." *Cabela's LLC v. Wellman*, 2018 WL 5309954, at *4 (Del. Ch. Oct. 26, 2018); *see also Country Life Homes, Inc. v. Shaffer*, 2007 WL 333075, at *5 (Del. Ch. Jan. 31, 2007) ("The new contract, as a general matter, will control over the old contract with respect to the same subject matter to the extent that the new contract is inconsistent with the old contract or if the parties expressly agreed that the new contract would supersede the old one.").

Here, the parties' new contract, set forth in the combination of the 2019 Admission Agreement and the 2019 Voluntary Arbitration Agreement, covers the

10

same subject matter as the first contract, set forth in the 2018 Voluntary Arbitration Agreement (Manor Care did not submit a copy of a 2018 Admission Agreement for Robert Senior); and the two contracts are in conflict. Accordingly, the later contract controls.

Both Robert Senior and Robert Junior refused to sign the 2019 Voluntary Arbitration Agreement, and someone wrote on that agreement "declined to sign." D.I. 13 ¶ 63. Moreover, none of the parties to the contract initialed section five of the 2019 Admission Agreement to express disagreement with that section's provision that "[a]ll claims relating to . . . *any past, present or future admission* of [Robert Senior] to the [Pike Creek facility], including . . . any claim relating in any way to the care and treatment provided to [Robert Senior], will be brought in the" Delaware Superior Court in New Castle County. D.I. 13-2 at 4 (emphasis added). Thus, by signing the 2019 Admission Agreement and not initialing section five, both Manor Care and Robert Junior made clear that the parties intended to litigate all their disputes in the Delaware Superior Court, not in an arbitration proceeding. The 2019 Admission Agreement and 2019 Voluntary Arbitration Agreement therefore supersede the 2018 Voluntary Arbitration Agreement.

Finally, at oral argument, Manor Care suggested for the first time that the 2019 Admission Agreement and 2019 Voluntary Arbitration Agreement could not supersede the 2018 Voluntary Arbitration Agreement because Robert Senior

signed the 2018 Voluntary Arbitration Agreement whereas Robert Junior signed the 2019 Admission Agreement on his father's behalf. Manor Care forfeited its right to raise this issue because it did not argue it squarely in its briefing. *See John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997); *Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 258 n.1 (3d Cir. 2007). But in any event, the argument fails on the merits because both Voluntary Arbitration Agreements say that they are agreements "between" Manor Care, "the Patient," "and" "the Patient's Representative"; both agreements require the definition of "parties" to "be interpreted as broadly as possible so as to bind and benefit any person who asserts any claim or against whom a claim is asserted by or on behalf of [Manor Care] or the Patient"; and both agreements define "Patient" to include "the Patient's Representative, the Patient's guardian, attorney-in-fact, agent, sponsor, or any person whose claim is derived through or on behalf of the Patient, including any . . . child, . . . personal representative, heir, or survivor, as well as anyone entitled to bring a wrongful death claim relating to the Patient." D.I. 13-2 at 15; D.I. 16-1 at 2. Indeed, Manor Care argued in its Reply Brief that Robert Junior is a party to the 2018 Voluntary Arbitration Agreement. *See* D.I. 26 at 5–6 ("The terms of the 2018 [Voluntary Arbitration] Agreement unambiguously apply to wrongful death claims, and define the parties as including wrongful death beneficiaries.").

12

## IV. CONCLUSION

For the reasons discussed above, I will deny Manor Care's motion to compel arbitration.

I will not address Manor Care's alternative arguments to dismiss the case because I expect that Manor Care will take an appeal from the denial of its motion to compel arbitration of Plaintiffs' claims. (Manor Care refused at oral argument to answer whether it would appeal a denial of the motion to compel, but its litigation conduct to this date strongly suggests that an appeal is coming.) Any such appeal would automatically divest this Court of jurisdiction, *see Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 215 n.6 (3d Cir. 2007) (adopting "the majority rule of automatic divestiture where the [arbitrability] appeal is neither frivolous nor forfeited"), and thus would further delay Plaintiffs' ability to litigate their claims on the merits in front of a jury. I am intent on doing what I can to streamline the appeals process, and I will therefore not give Manor Care legal rulings it might use to burden unnecessarily the Third Circuit and Plaintiffs. Accordingly, I will deny Manor Care's alternative motion to dismiss without prejudice to refile.

13